**BRODSKY & SMITH**
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Phone: (877) 534-2590
Facsimile: (310) 247-0160

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH WETTON,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>DSP GROUP, INC., OFER ELYAKIM, KENNETH H. TRAUB, THOMAS A. LACEY, CYNTHIA PAUL, GABI SELIGSOHN, YAIR SEROUSSI, and NORMAN TAFFE,<br><br>　　　　　Defendants. | Case No.:<br><br>**Complaint For:**<br><br>(1) Violation of § 14 (a) of the Securities Exchange Act of 1934<br>(2) Violation of § 20(a) of the Securities Exchange Act of 1934<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, Elizabeth Wetton ("Plaintiff"), by and through her attorneys, alleges upon information and belief, except for those allegations that pertain to her, which are alleged upon personal knowledge, as follows:

**SUMMARY OF THE ACTION**

1.　　Plaintiff brings this stockholder action against DSP Group, Inc. ("DSP Group" or the "Company") and the Company's Board of Directors (the "Board" or the "Individual Defendants,", collectively with the Company, the "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") as a result of Defendants' efforts to sell the Company to Synaptics Incorporated ("Parent") through merger vehicle Osprey Merger Sub, Inc. ("Merger Sub") (collectively with "Parent," "Synaptics") as a

result of an unfair process, and to enjoin an upcoming stockholder vote on a proposed all cash transaction (the "Proposed Transaction").

2. The terms of the Proposed Transaction were memorialized in an August 30, 2021, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement"). Under the terms of the Merger Agreement, Synaptics will acquire all of the remaining outstanding shares of DSP Group's common stock at a price of $22.00 per share in cash. As a result, DSP Group will become an indirect wholly-owned subsidiary of Synaptics.

3. Thereafter, on October 13, 2021, DSP Group filed a Preliminary Proxy Statement on Schedule PREM14A (the "Preliminary Proxy Statement") with the SEC in support of the Proposed Transaction.

4. The Proposed Transaction is unfair for a number of reasons. Significantly, the Preliminary Proxy Statement describes an insufficient process in which no committee of independent and disinterested board members was created to run the sales process.

5. Additionally, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits. For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration.

6. In violation of the Exchange Act, Defendants caused to be filed the materially deficient Preliminary Proxy Statement on October 13, 2021 with the SEC in an effort to solicit Plaintiff to vote her DSP Group shares in favor of the Proposed Transaction. The Preliminary Proxy Statement is materially deficient, deprives Plaintiff of the information necessary to make an intelligent, informed and rational decision of whether to vote in favor of the Proposed Transaction, and is thus in breach of the Defendants' fiduciary duties. As detailed below, the Preliminary Proxy Statement omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial

projections for DSP Group, provided by the Company to the Company's financial advisor Goldman Sachs & Co. LLC ("Goldman Sachs"); and (c) the data and inputs underlying the financial valuation analyses, if any, that purport to support the fairness opinion created by Goldman Sachs and provided to the Board.

7. Accordingly, this action seeks to enjoin the Proposed Transaction.

8. Absent judicial intervention, the Proposed Transaction will be consummated, resulting in irreparable injury to Plaintiff. This action seeks to enjoin the Proposed Transaction.

**PARTIES**

9. Plaintiff is a citizen of California and, at all times relevant hereto, has been a DSP Group stockholder.

10. Defendant DSP Group is a global leader in wireless chipsets for a wide range of smart-enabled devices. DSP Group is incorporated under the laws of the State of Delaware and has its principal place of business at 2055 Gateway Place, Suite 480, San Jose, CA 95110. Shares of DSP Group common stock are traded on the NasdaqGS under the symbol "DSGP".

11. Defendant Ofer Elyakim ("Elyakim") has been a Director of the Company at all relevant times. In addition, Elyakim serves as the Company's Chief Executive Officer ("CEO").

12. Defendant Kenneth H. Traub ("Traub") has been a director of the Company at all relevant times. In addition, Traub is the Company's Chairman of the Board of Directors.

13. Defendant Thomas A. Lacey ("Lacey") has been a director of the Company at all relevant times.

14. Defendant Cynthia Paul ("Paul") has been a director of the Company at all relevant times.

15. Defendant Gabi Seligsohn ("Seligsohn") has been a director of the Company at all relevant times.

16. Defendant Yair Seroussi ("Seroussi") has been a director of the Company at all relevant times.

17. Defendant Norman Taffe ("Taffe") has been a director of the Company at all relevant times.

18. Defendants identified in ¶¶ 11 - 17 are collectively referred to as the "Individual Defendants."

19. Non-Party Synaptics is among the world's largest medical technology, services and solutions companies. Synaptics is headquartered in San Jose, CA and its shares are traded on the NasdaqGS under the symbol "SYNA."

20. Non-Party Merger Sub is a wholly owned subsidiary of Parent created to effectuate the Proposed Transaction.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have. The Court has supplemental jurisdiction over any claims arising under state law pursuant to 28 U.S.C. § 1367.

22. Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because DSP Group maintains its principal offices in this district, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## SUBSTANTIVE ALLEGATIONS

*Company Background*

24. DSP Group a fabless semiconductor company, provides wireless chipset solutions. It operates through three segments: Home, Unified Communications, and SmartVoice. The Home

segment offers wireless chipset solutions for converged communication at home, including integrated circuits for cordless phones, home gateway devices, integrated circuits addressing home automation applications, and fixed-mobile convergence solutions. The Unified Communications segment offers solution for unified communications products, including office solutions that offer businesses VoIP terminals with converged voice and data applications. The SmartVoice segment offers products for the SmartVoice market that provide voice activation and recognition, voice enhancement, always-on and far-end noise elimination that target mobile phones, mobile headsets, and other devices. The Company markets and distributes its products through direct sales and marketing offices; and a network of global distributors to original equipment manufacturers and original design manufacturers. It has operations in the United States, Europe, Israel, Hong Kong, China, Japan, South Korea, Taiwan, India, Switzerland, and internationally. DSP Group has collaboration with Cloud of Things to introduce IoT cloud services gateway. DSP Group was incorporated in 1987 and is headquartered in San Jose, California.

25. The Company's most recent financial performance press release, revealing financial results from the quarter preceding the announcement of the Proposed Transaction, indicated sustained and solid financial performance. For example, in the August 2, 2021 press release announcing its 2021 Q2 financial results, the Company highlighted such milestones as Total Revenues of $28.34 million, up 26% from the second quarter 2020 and GAAP and non-GAAP gross margin of 53.4% and 54.1%, respectively, a 330 and 310 basis point increase.

26. Speaking on these positive results, CEO Defendant Elyakim commented on the Company's positive financial results as follows, "'We are very pleased with our outstanding results. We successfully navigated tight supply chain challenges, posted a record quarter on virtually all fronts, and surpassed our guidance on most financial metrics. Revenues of $35.8 million were at the high-end of our guidance range, up 26% year-over-year and 10% sequentially. Revenue growth was driven by strong demand for voice-centric products, predominantly in our IoAT businesses, which reached record revenues of $25 million, up 35% year over year and 19% sequentially and comprising 69% of total revenues. The favorable mix of products and the solid

revenue growth propelled record high non-GAAP gross margins of 54.1%. Looking ahead to the third quarter, we expect the solid momentum in our business to continue, translating into revenue growth both sequentially and year over year. These are exciting times for DSP Group as markets shift favorably in our direction, driving record demand for our core expertise. These promising trends are propelled by new models of living, working and interacting, all of which increasingly rely on voice-centric products delivered by our IoAT businesses. The breadth and depth of our technology offering, including a comprehensive portfolio of software and silicon, uniquely positions DSP Group to capitalize on these large growth opportunities. We are experiencing record design activity, which positions us well for continued revenue growth ahead.'"

27. These positive results are not an anomaly, but rather, are indicative of a trend of continued financial success and future potential success by DSP Group. Clearly, based upon these positive financial results and outlook, the Company is likely to have tremendous future success.

28. Despite this upward trajectory and continually increasing financial results, the Individual Defendants have caused DSP Group to enter into the Proposed Transaction without providing requisite information to DSP Group stockholders such as Plaintiff.

***The Flawed Sales Process***

29. As detailed in the Preliminary Proxy Statement, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants and was designed with only one concern in mind – to effectuate a sale of the Company by any means possible.

30. Notably, the Preliminary Proxy Statement fails to provide adequate information as to why the Board did not create a committee of independent and disinterested directors to run the sales process.

31. In addition, the Preliminary Proxy Statement is silent as to the nature of the confidentiality agreement entered into between the Company and Synaptics, whether this

agreement differed from any other agreement with potentially interested third parties not specifically mentioned by the Preliminary Proxy Statement, if so in all specific manners, including all specific terms of any such included "don't-ask, don't-waive" provisions or standstill provisions contained therein, including, all specific conditions, if any, under which such provisions would fall away.

32. It is not surprising, given this background to the overall sales process, that it was conducted in an inappropriate and misleading manner.

**The Proposed Transaction**

33. On August 30, 2021, DSP Group and Synaptics issued a joint press release announcing the Proposed Transaction. The press release stated, in relevant part:

> **SAN JOSE, Calif., August 30, 2021** – Synaptics Incorporated (Nasdaq: SYNA) and DSP Group, Inc. (Nasdaq: DSPG) today announced the signing of a definitive agreement, unanimously approved by the boards of directors of both companies, whereby Synaptics acquires DSP Group, a leading global provider of voice and wireless chipset solutions for converged communications, at $22.00 per share in an all-cash transaction. The combination is anticipated to generate annual run rate synergies of $30 million for the new entity to be realized within 12 months of closing and is immediately accretive to Synaptics' non-GAAP earnings. The transaction is expected to be financed through a combination of cash on hand and a fully committed, incremental debt financing arrangement with a projected close by the end of calendar year 2021, subject to DSP Group shareholder approval and customary closing conditions.
>
> DSP Group has leadership positions across multiple markets in the Internet of Audio Things (IoAT) with significant growth opportunities in low power SmartVoice, unified communications & collaboration, and wireless IoT devices. Most of these solutions are quite relevant to Synaptics' existing customer base, furthering the strategy of cross-selling portfolio devices.
>
> Synaptics recently announced its Low Power Edge AI initiative, which opens a significant long-term opportunity with ABI research predicting approximately 2.5 billion TinyML units to be sold by 2030. The addition of DSP Group's best-in-class SmartVoice products to Synaptics' Katana smart vision platform creates a complete portfolio that can both serve existing customer needs and address the significant future market. In addition, the combination further strengthens Synaptics' industry-leading wireless connectivity portfolio by adding DECT Ultra Low Energy (ULE), which enables a fully-featured intelligent home security solution.

"We continue to invest in technologies that tilt our product mix toward IoT applications," said Michael Hurlston, President and CEO of Synaptics. "DSP Group's expertise in SmartVoice and ULE wireless solutions, coupled with Synaptics' leadership position in far-field speech recognition and IoT directed Wi-Fi/BT combos enables us to deliver increasingly differentiated solutions to our combined customer base, while positioning us to lead the transition to AI enabled devices at the edge of the network."

"We are excited to join forces with Synaptics, a recognized leader in products for IoT. This combination provides a great result for our shareholders who have supported us through this journey, delivering meaningful and certain value," said Ofer Elyakim, CEO of DSP Group. "Our complementary portfolios together with the combination of our world-class engineering teams creates an exciting opportunity for DSP Group's core technology to extend further into our existing customers' product portfolio."

"The DSP Group board of directors unanimously supports this transaction as it represents an excellent outcome for our shareholders," commented Ken Traub, Chairman of the Board of Directors, DSP Group. "We would like to thank DSP Group's management and employees for their dedication to executing our strategy and congratulate them on this exciting achievement."

***Potential Conflicts of Interest***

34.     The breakdown of the benefits of the deal indicate that DSP Group insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders such as Plaintiff. The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff as a public stockholder of DSP Group.

35.     Notably, Company insiders, currently own large, illiquid portions of Company stock, company options, restricted stock units, and other equity awards, all of which will be exchanged for the merger consideration upon the consummation of the Proposed Transaction. However, while the Preliminary Proxy Statement provides the following information, it fails to disclose an accounting of how much merger consideration will be afforded to Company insiders as a consequence of the consummation of the Proposed Transaction and the cashing out of these amounts.

| Name of Beneficial Owner | Shares Beneficially Owned | Approximate Percent Beneficially Owned | Options and Restricted Stock Units Included in Shares Beneficially Owned |
|---|---|---|---|
| BlackRock, Inc. (1) 55 East 52nd St. New York, NY 10022 | 3,567,613 | 14.70% | - |
| Senvest Management, LLC (2) 540 Madison Avenue, 32nd floor New York, NY 10022 | 1,759,345 | 7.26% | - |
| The Vanguard Group (3) 100 Vanguard Blvd. Malvern, PA 19355 | 1,501,034 | 6.20% | - |
| Ofer Elyakim | 686,547 | 2.81% | 10,625 |
| Dror Levy | 42,689 | * | 6,313 |
| Tali Chen | 114,156 | * | 9,501 |
| Shira Fayans Birenbaum (4) | - | * | - |
| Thomas A. Lacey | 149,920 | * | 40,000 |
| Cynthia L. Paul (5) | 566,144 | 2.34% | 6,000 |
| Yair Seroussi | 62,420 | * | 39,000 |
| Norman Taffe | 107,020 | * | 70,000 |
| Kenneth H. Traub | 159,573 | * | 100,000 |
| All directors and executive officers as a group (9 persons) | 1,888,469 | 7.72% | 281,439 |

36. In addition, certain employment agreements with certain DSP Group executives, entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by Plaintiff and will be paid out as follows:

| Name | Cash ($)(1) | Equity ($) (2)(3)(4)(5) | Prerequisites /Benefits ($) (6) | Tax Reimbursement ($) | Other ($) | Total ($) |
|---|---|---|---|---|---|---|
| Ofer Elyakim | $1,347,500 | $4,867,500 | $303,000 | - | - | $6,518,000 |
| Dror Levy | $667,130 | $1,630,728 | $156,718 | - | - | $2,454,576 |
| Tali Chen | $413,243 | $1,402,412 | $81,520 | - | - | $1,897,175 |

37. The Preliminary Proxy Statement also fails to adequately disclose communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for Plaintiff to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders.

38. Thus, while the Proposed Transaction is not in the best interests of DSP Group, Plaintiff or Company stockholders, it will produce lucrative benefits for the Company's officers and directors.

### *The Materially Misleading and/or Incomplete Preliminary Proxy Statement*

39. On October 13, 2021, the DSP Group Board caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy Statement that, in violation the Exchange Act, failed to provide Plaintiff in his capacity as a Company stockholder with material information and/or provides materially misleading information critical to the total mix of information available to Plaintiff concerning the financial and procedural fairness of the Proposed Transaction.

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction*

40. Specifically, the Preliminary Proxy Statement fails to disclose material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Preliminary Proxy Statement fails to disclose:

   a. The specific reasoning why no committee of independent and disinterested Board members was created to run the sales process;

   b. Whether the confidentiality agreements entered into by the Company with Synaptics differed from any other unnamed confidentiality agreement entered into between the Company and potentially interested third parties (if any), and if so, in all specific manners;

   c. All specific conditions under which any standstill provision contained in any entered confidentiality agreement entered into between the Company and potentially interested third parties throughout the sales process, including Synaptics, would fall away; and

   d. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. Communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of Plaintiff and Company stockholders.

*Omissions and/or Material Misrepresentations Concerning DSP Group's Financial Projections*

41. The Preliminary Proxy Statement fails to provide material information concerning financial projections for DSP Group provided by DSP Group management and relied upon by Goldman Sachs in its analyses. The Preliminary Proxy Statement discloses management-prepared financial projections for the Company which are materially misleading.

42. Notably the Preliminary Proxy Statement reveals that as part of its analyses, Goldman Sachs reviewed, "management projections prepared by the Company's management."

43. Therefore, the Preliminary Proxy Statement should have, but fails to provide, certain information in the projections that DSP Group management provided to the Board and Goldman Sachs. Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors. Investors can come up with their own estimates of discount rates or [] market multiples. What they cannot hope to do is replicate management's inside view of the company's prospects." *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007)

44. With regard to the DSP Group Projections prepared by DSP Group Management, the Preliminary Proxy Statement fails to disclose material line items for the following metrics:

    a. EBITDA, including all underlying necessary metrics, adjustments, and assumptions, including the specific definition of EBITDA used and all underlying metrics.

45. The Preliminary Proxy Statement also fails to disclose a reconciliation of all non-GAAP to GAAP metrics utilized in the projections.

46. This information is necessary to provide Plaintiff in his capacity as a Company stockholder a complete and accurate picture of the sales process and its fairness. Without this

1    information, Plaintiff is not fully informed as to Defendants' actions, including those that may
2    have been taken in bad faith, and cannot fairly assess the process.

3         47.    Without accurate projection data presented in the Preliminary Proxy Statement,
4    Plaintiff is unable to properly evaluate the Company's true worth, the accuracy of Goldman Sachs'
5    financial analyses, or make an informed decision whether to vote in favor of the Proposed
6    Transaction.  As such, the Board has breached their fiduciary duties by failing to include such
7    information in the Preliminary Proxy Statement.

8    *Omissions and/or Material Misrepresentations Concerning the Financial Analyses by*
9    *Goldman Sachs*

10        48.    In the Preliminary Proxy Statement, Goldman Sachs describes its fairness opinion
11   and the various valuation analyses performed to render such opinion.  However, the descriptions
12   fail to include necessary underlying data, support for conclusions, or the existence of, or basis for,
13   underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the
14   valuations or evaluate the fairness opinions.

15        49.    With respect to the *Illustrative Discounted Cash Flow Analysis*, the Preliminary
16   Proxy Statement fails to disclose the following:

17         a. The specific inputs and assumptions used to determine the utilized discount rate
18            range of 8.0% to 9.0%;
19         b. DSP Group's weighted average cost of capital;
20         c. The range of illustrative terminal values for DSP Group calculated;
21         d. The specific inputs and assumptions used to determine the utilized perpetuity
22            growth rate range of 2.5% to 3.5%;
23         e. The specific inputs and assumptions used to determine the utilized exit terminal
24            year EBITDA multiples ranging from 2.9x to 4.2x;
25         f. DSP Group's target capital structure weightings;
26         g. DSP Group's cost of long-term debt;
27         h. DSP Group's after-tax yield on permanent excess cash, if any;
28

i. DSP Group's future applicable marginal cash tax rate;

j. The applied beta for DSP Group;

k. The specific "certain financial metrics for the United States financial markets generally" utilized; and

l. DSP Group's current net cash utilized.

50. With respect to the *Illustrative Present Value of Future Share Price Analysis*, the Preliminary Proxy Statement fails to disclose the following:

a. The specific inputs and assumptions used to determine the illustrative range of enterprise value to forward revenue multiples of 2.0x to 3.0x;

b. The specific current enterprise value / next twelve months revenue (which we refer to as EV / NTM Revenue) multiples for the Company and the selected companies, and the specific inputs and assumptions used to determine the same;

c. The specific average one- and five-year historical EV / NTM Revenue multiples of the Company and the selected companies, and the specific inputs and assumptions used to determine the same;

d. The specific inputs and assumptions used to determine the utilized discount rate of 8.5%; and

e. DSP Group's cost of equity.

51. With respect to the *Selected Companies Analysis*, the Preliminary Proxy Statement fails to disclose the following:

a. The specific metrics for each selected company;

b. The specific inputs and assumptions used to determine the Current, 1-year historical, and 5-year historical, EV / NTM Revenue multiples.

52. These disclosures are critical for Plaintiff to be able to make an informed decision on whether to vote in favor of the Proposed Transaction.

53. Without the omitted information identified above, Plaintiff is missing critical information necessary to evaluate whether the proposed consideration truly maximizes her value

1   and serves his interest as a stockholder. Moreover, without the key financial information and
2   related disclosures, Plaintiff cannot gauge the reliability of the fairness opinion and the Board's
3   determination that the Proposed Transaction is in his best interests as a public DSP Group
4   stockholder. As such, the Board has breached their fiduciary duties by failing to include such
5   information in the Preliminary Proxy Statement.

## FIRST COUNT

### Violations of Section 14(a) of the Exchange Act

### (Against All Defendants)

54. Plaintiff repeats all previous allegations as if set forth in full herein.

55. Defendants have disseminated the Preliminary Proxy Statement with the intention of soliciting stockholders, including Plaintiff, to vote in favor of the Proposed Transaction.

56. Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction. Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of her name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

57. As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

> No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement

in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

58. The Preliminary Proxy Statement was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

59. The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

60. The Individual Defendants were at least negligent in filing a Preliminary Proxy Statement that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy Statement not misleading.

61. The misrepresentations and omissions in the Preliminary Proxy Statement are material to Plaintiff, and Plaintiff will be deprived of her entitlement to decide whether to vote her shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## SECOND COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against all Individual Defendants)

62. Plaintiff repeats all previous allegations as if set forth in full herein.

63. The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants

- 16 -
COMPLAINT

knew or should have known that the Preliminary Proxy Statement was materially misleading to Plaintiff in her capacity as a Company stockholder.

64. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy Statement and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy Statement. The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy Statement before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

65. The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of DSP Group's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from Plaintiff and Company, and that the Preliminary Proxy Statement was misleading. As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy Statement and are therefore responsible and liable for the misrepresentations contained herein.

66. The Individual Defendants acted as controlling persons of DSP Group within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause DSP Group to engage in the wrongful conduct complained of herein. The Individual Defendants controlled DSP Group and all of its employees. As alleged above, DSP Group is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9. By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in her favor and against the Defendants, as follows:

A.  Enjoining the Proposed Transaction;

B.  Directing the Individual Defendants to exercise their fiduciary duties to disseminate a Preliminary Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.  Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

D.  Granting such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: November 1, 2021

**BRODSKY & SMITH**

By: _____
Evan J. Smith, Esquire (SBN 242352)
esmith@brodskysmith.com
Ryan P. Cardona, Esquire (SBN 302113)
rcardona@brodskysmith.com
9595 Wilshire Blvd., Ste. 900
Phone: (877) 534-2590
Facsimile (310) 247-0160

*Attorneys for Plaintiff*

- 18 -
COMPLAINT

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

ELIZABETH WETTON

**(b)** County of Residence of First Listed Plaintiff   Orange Cty., CA
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Evan J. Smith, Brodsky & Smith,
9595 Wilshire Boulevard, Suite 900   Beverly Hills, CA 90212
Tel: (877) 534-2590   Fax: (310) 247-0160   Email: esmith@brodskysmith.com

## DEFENDANTS

DSP GROUP, INC., OFER ELYAKIM, KENNETH H. TRAUB, THOMAS A. LACEY, CYNTHIA PAUL, GABI SELIGSOHN, YAIR SEROUSSI, and NORMAN TAFFE

County of Residence of First Listed Defendant   Santa Clara Cty., CA
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

1   U.S. Government Plaintiff   **×** 3   Federal Question
*(U.S. Government Not a Party)*

2   U.S. Government Defendant   4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff (For Diversity Cases Only) and One Box for Defendant)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | 1 | Incorporated *or* Principal Place of Business In This State | 4 | 4 |
| Citizen of Another State | 2 | 2 | Incorporated *and* Principal Place of Business In Another State | 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | 625 Drug Related Seizure of Property 21 USC § 881 | 422 Appeal 28 USC § 158 | 375 False Claims Act |
| 120 Marine | 310 Airplane | 365 Personal Injury – Product Liability | 690 Other | 423 Withdrawal 28 USC § 157 | 376 Qui Tam (31 USC § 3729(a)) |
| 130 Miller Act | 315 Airplane Product Liability | | | | |
| 140 Negotiable Instrument | 320 Assault, Libel & Slander | 367 Health Care/ Pharmaceutical Personal Injury Product Liability | **LABOR** | **PROPERTY RIGHTS** | 400 State Reapportionment |
| 150 Recovery of Overpayment Of Veteran's Benefits | 330 Federal Employers' Liability | | 710 Fair Labor Standards Act | 820 Copyrights | 410 Antitrust |
| | | 368 Asbestos Personal Injury Product Liability | 720 Labor/Management Relations | 830 Patent | 430 Banks and Banking |
| 151 Medicare Act | 340 Marine | | | 835 Patent—Abbreviated New Drug Application | 450 Commerce |
| 152 Recovery of Defaulted Student Loans (Excludes Veterans) | 345 Marine Product Liability | **PERSONAL PROPERTY** | 740 Railway Labor Act | | 460 Deportation |
| | 350 Motor Vehicle | 370 Other Fraud | 751 Family and Medical Leave Act | 840 Trademark | 470 Racketeer Influenced & Corrupt Organizations |
| | 355 Motor Vehicle Product Liability | 371 Truth in Lending | 790 Other Labor Litigation | 880 Defend Trade Secrets Act of 2016 | 480 Consumer Credit |
| 153 Recovery of Overpayment of Veteran's Benefits | 360 Other Personal Injury | 380 Other Personal Property Damage | 791 Employee Retirement Income Security Act | **SOCIAL SECURITY** | 485 Telephone Consumer Protection Act |
| 160 Stockholders' Suits | 362 Personal Injury -Medical Malpractice | 385 Property Damage Product Liability | **IMMIGRATION** | 861 HIA (1395ff) | 490 Cable/Sat TV |
| 190 Other Contract | | | | 862 Black Lung (923) | **×** 850 Securities/Commodities/ Exchange |
| 195 Contract Product Liability | **CIVIL RIGHTS** | **PRISONER PETITIONS** | 462 Naturalization Application | 863 DIWC/DIWW (405(g)) | 890 Other Statutory Actions |
| 196 Franchise | 440 Other Civil Rights | **HABEAS CORPUS** | 465 Other Immigration Actions | 864 SSID Title XVI | 891 Agricultural Acts |
| **REAL PROPERTY** | 441 Voting | 463 Alien Detainee | | 865 RSI (405(g)) | 893 Environmental Matters |
| 210 Land Condemnation | 442 Employment | 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | 895 Freedom of Information Act |
| 220 Foreclosure | 443 Housing/ Accommodations | 530 General | | 870 Taxes (U.S. Plaintiff or Defendant) | 896 Arbitration |
| 230 Rent Lease & Ejectment | 445 Amer. w/Disabilities–Employment | 535 Death Penalty | | 871 IRS–Third Party 26 USC § 7609 | 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| 240 Torts to Land | | **OTHER** | | | |
| 245 Tort Product Liability | 446 Amer. w/Disabilities–Other | 540 Mandamus & Other | | | |
| 290 All Other Real Property | 448 Education | 550 Civil Rights | | | 950 Constitutionality of State Statutes |
| | | 555 Prison Condition | | | |
| | | 560 Civil Detainee– Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

**×** 1 Original Proceeding   2 Removed from State Court   3 Remanded from Appellate Court   4 Reinstated or Reopened   5 Transferred from Another District *(specify)*   6 Multidistrict Litigation–Transfer   8 Multidistrict Litigation–Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
15 U.S.C. § 78aa and 28 U.S.C. § 1331
Brief description of cause:
Violations of the Exchange Act

## VII. REQUESTED IN COMPLAINT:

CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.   **DEMAND $**   CHECK YES only if demanded in complaint:
JURY DEMAND: **×** Yes   No

## VIII. RELATED CASE(S), IF ANY *(See instructions)*:

JUDGE   DOCKET NUMBER

## IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)

(Place an "X" in One Box Only)   **×** SAN FRANCISCO/OAKLAND   SAN JOSE   EUREKA-MCKINLEYVILLE

DATE   11/01/2021   **SIGNATURE OF ATTORNEY OF RECORD**   Evan J. Smith

JS-CAND 44 (rev. 10/2020)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II. **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

   (1) United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

   (2) United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

   (3) Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

   (4) Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the six boxes.

   (1) Original Proceedings. Cases originating in the United States district courts.

   (2) Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

   (3) Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

   (4) Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

   (5) Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

   (6) Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

   (8) Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

   Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

   Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

   Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX. **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.